UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                     Case Number 15-20317

v.                                         Honorable David M. Lawson

PIERRE LIVINGSTON,

          Defendant.
_____/

## ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

Defendant Pierre Livingston, who is beginning the third year of his five-year prison sentence for drug crimes, asks the Court to resentence him to time served under the authority of the compassionate release provision of 18 U.S.C. § 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239, and impose a period of supervised release equivalent to the remaining months of his prison term during which he would be confined to his home. The government takes issue with Livingston's exhaustion of his administrative remedies within the Bureau of Prisons (BOP), a necessary prerequisite for seeking compassionate release. There is no merit to that argument. The government also argues that Livingston has not demonstrated that extraordinary circumstances justify immediate release or that he qualifies for release under any other provision of section 3582(c)(1). The Court agrees. The motion will be denied.

I.

Livingston was part of a drug trafficking organization known as the "500 Block Boys" that operated in one of Detroit's east side neighborhoods. The FBI began investigating the group in early 2011. Agents obtain authorization to wiretap the phone of Livingston's co-defendant, Maurice Littles. They intercepted conversations between Littles and Livingston during which the

two negotiated the sale of over four kilograms of cocaine. Littles and Livingston also discussed dog fighting and dog fights, another illegal activity promoted by Littles, which Livingston attended. The Littles wiretap also furnished the FBI agents with evidence to support search warrants for numerous locations, including Livingston's house. When that house was searched, agents found cocaine, drug trafficking items, and $14,000 in cash. Livingston and 23 others were charged with drug trafficking offenses. The charges against Livingston also included animal fighting.

On July 17, 2017, Livingston pleaded guilty under a plea agreement to conspiracy to possess with intent to distribute controlled substances and conspiracy to sponsor and participate in animal fighting. The parties contemplated that Livingston was safety valve eligible. However, the probation department unearthed additional history that rendered him ineligible for the safety valve and significantly increased his sentencing guideline range to 135 to 168 months. On April 30, 2018, the Court sentenced Livingston to below-guideline prison sentence of 60 months, to be followed by four years of supervised release. Livingston began serving his sentence on July 1, 2018. He is currently incarcerated at Morgantown FCI in Morgantown, West Virginia. To date, there are no confirmed cases of COVID-19 among inmates at this facility, and one confirmed case of a staff member. Although he recently started year three of his sentence, the BOP projects his release date at October 2, 2021.

Livingston is a 48-year-old African-American male. His medical records show that he suffers from prostate cancer, high blood pressure, obesity, type 2 diabetes, and an eye condition that can cause blurred vision. He states that if released, he will reside in Detroit with the mother of his 15-year-old daughter.

On April 24, 2020, Livingston sent an email requesting compassionate release because he had a higher risk of getting sick based on his history of high blood pressure and prostate cancer. On May 5, 2020, the warden denied his request. On June 2, 2020, Livingston, through counsel, filed a motion for compassionate release, asking that he be released immediately to begin his supervised release term, or that he be allowed to serve the rest of his prison term on home confinement.

II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). "But that rule comes with a few exceptions, one of which permits compassionate release." *Ibid.* "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). However, prisoners may not seek judicial relief before they have sought release under this statute from the prison warden. "Even though [the] exhaustion requirement does not implicate [the Court's] subject-matter jurisdiction, it remains a mandatory condition," and "[i]f

the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own behalf. To do that, he must fully exhaust all administrative rights to appeal with the prison or wait 30 days after his first request to the prison." *Id.* at 833-34 (quotations omitted).

A.

The government does not take issue with the timing of Livingston's motion filed here in relation to the date he presented his request to the warden, even though Livingston did not wait 30 days to file it after his request was denied. Livingston submitted his request for compassionate release to the warden at FCI Morgantown on April 24, 2020, and waited more than 30 days — to June 4 — to file his motion. There is no defect in that aspect of Livingston's exhaustion efforts. *Alam*, 960 F.3d at 834 ("[P]risoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the [administrative] appeals available to them."). Instead, the government points out that Livingston mentioned only high blood pressure and prostate cancer as medical ailments that warranted compassionate release, and it argues that Livingston has not exhausted his administrative remedies as to any other health conditions not raised in his request with the warden.

Although there is some support for the government's position, *see United States v. Asmar*, No. 18-20668, 2020 WL 3163056, at *3 (E.D. Mich. June 5, 2020), the majority of federal courts confronted with the argument now raised by the government generally have been skeptical of the notion that the statute imposes any requirement of "issue exhaustion" on requests for compassionate release, or that a prisoner explicitly must mention the pandemic as a basis of his administrative request, or else submit and exhaust a fresh request on that ground — and wait yet another 30 days — before seeking judicial review. *United States v. Garner*, No. 14-13, 2020 WL

3632482, at *3 & n.2 (S.D. Tex. July 3, 2020) ("This question of 'issue exhaustion' has not been addressed by the Fifth Circuit Court of Appeals, and it may well be applicable in certain situations. However, the Court is not persuaded that it applies in this case, primarily for the reasoning offered by the Government elsewhere in its response: COVID-19 does not constitute an independent basis for . . . compassionate release.") (collecting cases); *see also Miller v. United States*, No. 16-20222, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) ("[T]he Government argues that Miller's exhaustion should not be honored, because he did not specify requesting release due to the COVID-19 outbreak. The Court finds this argument to be unfounded. Miller, then and now, seeks release due to his myriad of serious health conditions. The COVID-19 pandemic merely accentuates his meritorious claims for release.").

Here, the statutory ground for the request has not changed from when it first was submitted; the defendant seeks now, as he did at the administrative level, release based on "extraordinary and compelling circumstances," under the authority of 18 U.S.C. § 3582(c)(1)(A)(i). He described the circumstances in his administrative petition that he felt were extraordinary and compelling. He now advances others, which may or may not have arisen since the request first was tendered. But the underlying authority and ground for the relief sought has not changed, and it would be inappropriate under the circumstances to impose any further exhaustion requirement, which in any event is not mandated in any plain terms of the statute. *See Garner*, No. 14-13, 2020 WL 3632482, at *3 (S.D. Tex. July 3, 2020) ("Defendant has not changed the underlying basis of his request for . . . compassionate release by this motion; to the contrary, he argues that COVID-19 renders him even more medically vulnerable than before. In short, Defendant argues that the COVID-19 pandemic increases his already-existing medical vulnerability, which he has already exhausted."). The BOP certainly well knew, and now knows, about the pandemic and the risks to inmates, as its

published reports and directives evidence. It has had more than ample time to act on the defendant's April request, having before it all of the pertinent information about both the defendant and the circumstances that pose risks to his health. As one district court aptly observed:

> The statute does not require issue exhaustion as argued by the United States and even if the Court was inclined to impose that requirement, it would be futile. The Court is frustrated by the fact that the warden has apparently ignored the first request. There is nothing in the record to suggest a second request by Defendant would be treated in any other way. By ignoring these requests, the warden is inviting the Court's involvement. This Court will accept that invitation. The COVID-19 pandemic requires action, and the Court is not willing to wait.

*United States v. Dillard*, No. 15-00170, 2020 WL 2564638, at *2 (D. Idaho Apr. 27, 2020).

The defendant sufficiently presented his request for release to prison authorities, and he has waited more than 30 days for a favorable response, which has been refused. That is sufficient to satisfy section 3882(c)(1)(A)'s exhaustion requirement.

B.

Under that statute, the Court can order a reduction of a sentence, even to time served, *first*, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," *second*, if "extraordinary and compelling reasons warrant such a reduction," and *third*, the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317 (6th Cir. 2019) (en banc) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it").

The government offers several reasons for denying release. It insists that compliance with the Sentencing Commission's policy statement is mandatory, and points to one line in section 1B1.13 that requires the prisoner to prove lack of dangerousness. But that requirement is a

condition of 3582(c)(1)(A)(ii). Livingston has invoked 3582(c)(1)(A)(i), which contains no such requirement.

That is not to say that dangerousness is irrelevant. It is a factor incorporated in section 3551(a), which must be "consider[ed]" before release for extraordinary and compelling reasons may be allowed. *See* 18 U.S.C. § 3553(a)(2)(C) (requiring a sentencing court to consider "the need … to protect the public from further crimes of the defendant"). And any sentence reduction also must account for "the seriousness of the offense," the need "to promote respect for the law," and "afford adequate deterrence to criminal conduct." *Id.* § (2)(A), (C). These factors are to be considered together with the prisoner's circumstances to arrive at a conclusion that they are sufficiently extraordinary and compelling to justify a sentence reduction.

Livingston's crimes were serious. He was a member of a drug trafficking organization that distributed crack cocaine, powder cocaine, and heroin in Detroit's neighborhoods. When agents searched many of the houses that Livingston and his co-conspirators used for their criminal enterprise, they found a large quantity of drugs, 32 firearms, and 24 dogs bred for fighting. Livingston was convicted previously of drug trafficking and served prison time for that conviction. And in this case, he has served less than half of his 60-month sentence.

These factors do not favor release, but they are not disqualifying by themselves. To establish extraordinary and compelling reasons for the relief he requests, Livingston points to the conditions of his physical health, arguing that he is vulnerable to complications if he were to contract COVID-19, and he professes fear that his prostate cancer will recur.

Livingston is understandably concerned about being infected with the coronavirus. "The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease,

respiratory disease, diabetes, and immune compromise. If contracted, COVID-19 can cause severe complications and death. Because there is no current vaccine, the Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing." *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020). "The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration." *United States of America v. Ortiz*, No. 16-439, 2020 WL 3640582, at *2 (S.D.N.Y. July 6, 2020).

Moreover, "the crowded nature of federal detention centers presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread. And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons, in the past months, numerous [federal] courts . . . have ordered the temporary release of inmates held in pretrial or presentencing custody and, in more limited instances, the compassionate release of high-risk inmates serving federal sentences." *Ortiz*, 2020 WL 3640582, at *2 (collecting cases; footnotes omitted).

However, Livingston has not shown that his medical conditions put him at greater risk of complications if he were to contract COVID-19. His prostate cancer has been treated and he is doing well. Medical staff performed biopsies which showed Gleason scores of 7 and 8. A Gleason Score measures the virulence of the type of prostate cancer, with a score of 8 to 10 indicating an aggressive type. Livingston declined surgery offered by a BOP doctor and instead opted for radiation therapy. He completed that therapy on March 7, 2019. A few months later, in June 2019, Livingston's oncologist measured Livingston's PSA (Prostate Specific Antigen) as "undetectable." More recently, on March 17, 2020, his PSA level was less than 0.05 ng/mL. A

result less than 4.0 ng/mL is considered normal.  Around April of 2020, Livingston's oncologist noted that there is "no evidence of recurrence" and so he was taken off Bicalutamide, a hormone therapy for prostate cancer.

Livingston was diagnosed with high blood pressure when he was 43 years old.  He is compliant with his prescribed medication.  With that medication and diet, Livingston is as "at [his] goal" to control his blood pressure.  BOP medical staff has also classified Livingston as "pre-diabetic" and instructed him to make "life style changes."  Livingston reported he was watching his diet and trying to lose weight.  The BOP has also been monitoring Livingston's A1C factor, a common blood test used to diagnose diabetes.  A normal test is below 5.7 percent.  Those tests showed results of 6.9% (on July 24, 2018), 6.2% (on November 8, 2018), and 5.9% (on March 17, 2020).  In other words, Livingston's A1C test results showed levels generally between 5.7% and 6.4%, or prediabetes levels.  Livingston had one test above 6.5%.

It is widely recognized and publicly acknowledged that persons who are diabetic face increased risk of severe consequences from potential COVID-19 infection.  *United States v. Lassister*, No. 17-232, 2020 WL 3639988, at *4 (D. Md. July 6, 2020) ("The risk factors include age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.") (citing *Coronavirus Disease 2019 (COVID-19)*, People Who Are At Risk for Severe Illness, Centers for Disease Control & Prevention (June 25, 2020), https://bit.ly/2WBcB16).  The combination of diabetes and hypertension may further increase the risk of severe complications from potential infection. *Compare Malam v. Adducci*, --- F. Supp. 3d---, No. 20-10829, 2020 WL 2468481, at *7 (May 12, 2020) (ordering supplemental briefing) *with Perez-Perez v. Adducci*, --- F. Supp. 3d ---, No. 20-10833, 2020 WL 2305276, at *3 (E.D. Mich. May 9, 2020) (granting petition for habeas corpus

because defendant had hypertension and was housed in a facility with a confirmed case of COVID-19). "Pre" diabetes, however, is not a risk factor recognized by the CDC.

Livingston has also been diagnosed with Keratoconus, i.e., a thinning of the cornea of the eye, which then gradually bulges into a cone shape, blurring vision and causing sensitivity to light. To deal with this issue, Livingston was going to be fitted with contact lenses.

Livingston's chief concern now is that he has found blood in his urine and he is fearful that his cancer has returned. But he has not connected that with a fear of contracting COVID-19. His reply brief is devoted mostly to the adequacy of the BOP's response to his prostate cancer and his desire to be released in order to be treated by private medical providers at home. He explains that once released, he will be able to meet with several urological surgeons to make an informed decision about whether to have his prostate removed or continue with some form of radiation.

All of these concerns are understandable, but Livingston, who is only 48 years old, has not shown that he is suffering from medical conditions that place him at a greater risk of serious complications if he contracted COVID-19 while incarcerated.

Nor do Livingston's medical conditions make him more susceptible to contracting the virus. Infection comes from environmental factors. And even though several BOP facilities have experienced a proliferation of confirmed COVID-19 cases, there are no reported cases of COVID-19 among the inmates at FCI Morgantown, and only one case among staff since the pandemic has become widespread in the broader population in February of this year.

None of this is to minimize the seriousness of the coronavirus pandemic or the alarming rapidity of its spread within federal prisons. But the pandemic is a global phenomenon and some risk is inherent no matter where Livingston resides, either at home or in prison. He has not put forth any convincing evidence to demonstrate that he is at an especially elevated risk of harm in

the present situation of confinement. And Michigan has a significant number of confirmed COVID-19 cases. Livingston has not demonstrated "extraordinary and compelling reasons" to reduce his sentence to time served.

Livingston also has requested that the Court recommend to the BOP that he be placed in home confinement to serve the rest of his prison sentence. That relief is available under the CARES Act, 18 U.S.C. § 12003(b)(2), but not from the Court. Section 12001(b)(2) is directed at the Attorney General. Under that section, "[d]esignation of an inmate's place of confinement, including placement in home confinement, rests within the absolute discretion of the BOP." *United States v. McCloskey*, No. 18-CR-260, 2020 WL 3078332, at *2 (S.D. Ga. June 9, 2020); *see also United States v. Calderon*, No. 19-11445, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (explaining that under 34 U.S.C. § 60541(g)(1)(A), the Attorney General "may" release eligible elderly offenders, and the district court was without jurisdiction to grant relief). Any recommendation from the Court has no binding effect on the BOP. 18 U.S.C. § 3621(b). Nonetheless, the Court recommends that the BOP give careful consideration to placing Livingston in a community setting as soon as circumstances permit.

### III.

Livingston has exhausted his administrative remedies, but he has not demonstrated that compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) is justified.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 740) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 11, 2020